FILED

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

DEC – 5 2024

*Newport News Division*

CLERK U.S. DISTRICT C...
NEWPORT NEWS, V...

IN THE MATTER OF THE SEARCH OF:

**APPLE IPHONE 8**
**APPLE IPHONE 12**

**Filed Under Seal**

Case No. 4:24sw152

**THE PERSON OF JOHN V. NAPOLITANO FOR**
**APPLE IPHONE 8 AND APPLE IPHONE 12**

**Filed Under Seal**

Case No. 4:24sw153

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

I, Special Agent Keysha L. Bailey, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1. I make this affidavit pursuant to Federal Rule of Criminal Procedure 41, in support of applications for search warrants authorizing the examination of property – electronic devices, further described in Attachment A-1 – which are currently believed to be in the possession of subject, JOHN V. NAPOLITANO ("NAPOLITANO"), further described in Attachment A-2.

2. Your affiant is a Special Agent with the United States Department of Justice, Federal Bureau of Investigation (FBI). I have been employed by the FBI as a Special Agent since January, 2018. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7). That is, I am an officer of the United States, who is empowered by law to conduct investigations regarding violations of United States law, to execute warrants issued under the authority of the United States, and to make arrests of the offenses

enumerated in Title 18, United States Code, § 2252A(a)(2). Prior to my employment with the FBI, I worked in Finance and Human Resources. I am currently assigned to work white collar and complex financial crimes matters. I also assist the FBI Safe Streets Peninsula Task Force (SSPTF). In the course of my duties, I am responsible for investigating crimes which include, but are not limited to, bankruptcy fraud, complex financial crimes, violent crimes, criminal organizations, crimes against children, and hate crimes.

3.      I have participated in various types of investigations and associated activities, including executing search and seizure warrants. I have received training and gained experience in interviewing techniques, arrest procedures, search warrant applications, the execution of searches and seizures, and various other criminal laws and procedures. As a Special Agent, I have served as the affiant on search warrants.

## REASON FOR AFFIDAVIT

4.      This affidavit is made in support of an application for search warrant for the following:

| Attachments | Search Target | Description (set forth in Attachments A-1 to A-2) |
|---|---|---|
| A-1 | IPHONE 8 AND IPHONE 12 ("SUBJECT DEVICES") | Set forth in Attachment A-1 |
| A-2 | NAPOLITANO PERSON FOR SUBJECT DEVICES | NAPOLITANO is a white man born in 1957, assigned a Social Security number ending in 3212, and is depicted in Attachment A-2. |

5.      Based on the information set forth below, and the investigation to date by law enforcement, your affiant believes that NAPOLITANO has engaged in Wire Fraud, in violation of 18 U.S.C. § 1343 and other federal offenses ("SUBJECT OFFENSES"). Your affiant believes there is probable cause that NAPOLITANO and other individuals engaged in a scheme to defraud LD AMORY SEAFOOD INC. ("LD AMORY") via a "kickback" scheme. Further,

2

3

there is probable cause to believe that the SUBJECT DEVICES will contain evidence, contraband, fruits, and instrumentalities of violations of the aforementioned crime. Specifically, there is probable cause to believe that the SUBJECT DEVICES were used in the course of and/or contain evidence, documents, correspondence, proceeds, and financial records maintained by NAPOLITANO (as further described in Attachment B). SUBJECT DEVICES are believed to be in the possession of NAPOLITANO.

6.    Based on my training, experience, knowledge, and participation in criminal investigations, and accumulated knowledge from consultations with other law enforcement agents, including debriefings and interviews of known offenders in other cases, I also know the following:

a. Fraud offenses are activities which frequently continue over many months and even years.

b. Kickback payments are payments made to someone who has facilitated or helped facilitate an illicit transaction.

c.  Offenders who commit fraud offenses often keep records of their illegal activities for a lengthy period of time, even beyond the time during which the crimes occurred.

d. Offenders who commit fraud offenses commonly maintain hard copy or computer files, books, records, receipts, notes, ledgers, journals, diaries, address books, and other sundry materials, and papers relating to their crimes; and

e. Offenders who commit fraud offenses often possess evidence, fruits, and instrumentalities relating to such offenses at their homes, vehicles, and electronic devices.

3

7.      From my knowledge, training, and experience, I know that individuals who commit crimes like those addressed herein often secrete or conceal evidence of their crimes in their residences, vehicles, or other locations closely associated with them and under their control. Searches of those locations often reveal evidence, instrumentalities, contraband, and/ or fruits of the crimes under investigation, including related physical and electronic communications (e.g. files, letters, email/text messages with co-conspirators, victims, or institutions).   Evidence commonly stored in residences or in these devices and/or electronic records commonly maintained in residences (e.g. time-stamped receipts, financial and employment records, photos/videos) often reveals identity, device, location, travel, and purchase information and therefore may corroborate witness statements and other relevant evidence.

8.      In particular, your affiant knows that electronic devices, particularly those connected to the internet like smartphones, are not only a common and essential feature of daily life, but they are also items of value, so suspects often keep such items in areas under their immediate control, such as on their persons or in their homes or vehicles. Searches of electronic devices, accounts, and electronically-stored information ("ESI") contain a similar scope of evidence as residences, particularly since many such devices are capable of taking photographs and videos and communicating with others in real time.  Further, searches of ESI and devices can provide crucial chronological and geographic context due to the manner in and the frequency with which they interact with each other and service providers.

9.      This affidavit is based upon information that I have gained from my investigation, my training and experience, as well as information gained from conversations with other law enforcement officers.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

I have set forth only the facts that I believe are necessary to establish probable cause. The information contained in the affidavit is based upon review of documents and records, interviews of witnesses and my personal observations and knowledge.

## DEFINITIONS AND TECHNICAL TERMS

10.    The term "computer" is defined in 18 U.S.C. $ 1030(e)(1) and includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including devices like desktop computers, laptops/notebook computers, mobile phones, tablets, server computers, and network hardware.

11.    "Computer passwords and data security devices," consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

12.    "Internet Protocol Address" (IP Address) refers to a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Devices can have IP addresses that are "dynamic," meaning assigned a different unique number every time it accesses the Internet, or "static," meaning assigned a long-term, unchanging number.

5

13.    "Internet Service Providers" (ISPs) are commercial organizations which provide individuals and businesses access to the Internet, often together with a range of other functions, including web hosting, e-mail, remote storage, and colocation of computers and other communications equipment. ISPs can offer various means by which to access the Internet and typically charge a fee based upon the type of connection and volume of data, called "bandwidth," that the connection supports.  Many ISPs assign each subscriber an account name such as a username or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account.

14.    "Log Files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, log-on, log-off times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

15.    The terms "records," "materials," and "information" include all forms of creation or storage - including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies) - in whatever form they are found and includes draft versions or modifications that may have been created or stored in any electrical, electronic, or magnetic form. One form in which the records might be found is data stored on a computer's hard drive or other storage media, thus the requested warrant would authorize the search and seizure of

6

ESI under Federal Rule of Criminal Procedure 41(e)(2)(B). Rule 41 drew from the "broad and flexible" description of ESI in Federal Rule of Civil Procedure 34, which itself includes "writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations," regardless of form or need for translation.

16.     The term "storage medium" includes any physical object upon which computer data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

17.     "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol.

**BACKGROUND OF THE INVESTIGATION AND SUMMARY OF PROBABLE CAUSE**

18.     The FBI has been investigating a scheme to defraud LD AMORY by NAPOLITANO and others known and unknown to law enforcement.

19.     In or about March 2024, FBI Norfolk initiated an investigation into allegations that NAPOLITANO committed wire fraud from in or about March 2020 to in or about August 2024.

20.     NAPOLITANO, resides at 551 Settlers Landing Rd, Apt 204, Hampton, VA, which is located in the Eastern District of Virginia.

21.     From in or about March 2020 to in or about August 2024, NAPOLITANO worked as a salesman at LD AMORY in Hampton, VA, which is located in the Eastern District of Virginia. NAPOLITANO was paid a weekly gross salary of $950.00.

22.     NAPOLITANO was responsible for phone sales, finding new customers, and selling fish wholesale to existing customers.

7

23.    NAPOLITANO used his personal cellular telephone, telephone number 516-507-0400 to conduct sales calls and transactions.

24.    NAPOLITANO handled the sales of wholesale fish from LD AMORY to J&K SEAFOOD located at 800 Food Center Drive, Unit 94, Bronx, New York 10474. NAPOLITANO worked with FRANKIE at J&K SEAFOOD on the sales between LD AMORY and J&K SEAFOOD.

25.    The investigation identified FRANKIE as Frank Azzato ("FRANKIE").

26.    NAPOLITANO communicated with FRANKIE at telephone number 718-679-2682.

27.    J&K SEAFOOD was LD AMORY's biggest wholesale buyer of fish.

28.    LD AMORY sold the fish on consignment to J&K SEAFOOD, meaning that the price of the fish being sold was based on the supply and demand in J&K SEAFOOD's market in New York. LD AMORY said the price was usually confirmed with J&K SEAFOOD within three to four days.

29.    Once the price was agreed upon between both LD AMORY and J&K SEAFOOD, a sales order was generated which was then converted into an invoice.

30.    C.M., the Vice President of LD AMORY, advised during an interview with the FBI that for about a year and half, NAPOLITANO constantly asked for a pay raise.[1] LD AMORY was operating in the "red," so no pay raises were given.

---

[1] In or about April or May 2024, NAPOLITANO stopped asking C.M. for a pay raise.

31.    In January 2024, C.M. noticed NAPOLITANO had brought a new Chevrolet Colorado pickup truck.

32.    In January 2024, C.M. began noticing discrepancies in the invoices and payments received from J&K SEAFOOD.

33.    On January 5, 2024, a sales order was generated for an order to J&K SEAFOOD in the amount of $29,330 for Black Sea Bass at the following prices (invoice below):

    a.    1,000 x $3.00 = $3,300.00

    b.    5,000 x $4.00 = $20,000.00

    c.    1,005 x $6.00 = $6,030.00



34.    When the check for the above invoice was received from J&K SEAFOOD, C.M. noticed it did not match the sales order. C.M. pulled the corresponding invoice and noticed the prices had been changed to a lower price (See a below).



35.    According to C.M., the invoice was $3,301.25 less than the agreed upon sales order.

C.M. advised LD AMORY's accounts receivable team to notify C.M. if any other checks came in

that did not match the sales order.

11

36.    C.M. said more checks were received from J&K SEAFOOD that did not match the sales orders.  C.M. said the invoices had been changed to lower prices.

37.    LD AMORY did a review of all of NAPOLITANO's sales orders to J&K SEAFOOD.  C.M. noticed that NAPOLITANO was going into the QuickBooks systems and changing the invoices to lower prices.

38.    NAPOLITANO was changing the invoices on Saturdays when no one was in the office.

39.    Below are some more examples of the changed invoices that did not match the sales orders:

**L.D. Amory & Company, Inc.**

Hampton VA 23669

# Sales Order

| Date | S.O. No. |
|------|----------|
| 1/19/2024 | 151 - 65588 |

| Name / Address | Ship To |
|----------------|---------|
| J & K Seafood<br>800 Food Center Drive<br>Unit 94<br>Bronx, NY 10474 | J & K Seafood<br>800 Food Center Drive<br>Unit 94<br>Bronx, NY 10474 |

| Terms | Rep | P.O. No. | Ship Date | Via | FOB |
|-------|-----|----------|-----------|-----|-----|
| JN | Net 15 | 1/19/2024 | frankie | Tidewater | |

| Quantity | U/M | Piece Count | Item Code | Description | Price Each | Amount |
|----------|-----|-------------|-----------|-------------|------------|--------|
| 50.00 | | 1 | Black Sea Ba... | 1x50lbs | 3.00 | 150.00 |
| 189.00 | | 4 | Black Sea Ba... | 4 cases | 4.00 | 756.00 |
| 158.00 | | 3 | Black Sea Ba... | 3 cases | 6.00 | 948.00 |
| 500.00 | | 10 | Skate Wings | 10x50lbs | 1.00 | 500.00 |
| 1,250.00 | | 25 | Fluke-Medium | 25x50lbs | 5.00 | 6,250.00 |
| 1,250.00 | | 25 | Fluke-Large | 25x50lbs | 5.50 | 6,875.00 |
| 904.00 | | 9 | Catfish Jumbo | 9 cases | 1.25 | 1,130.00 |

| | Total | $16,609.00 |
|---|-------|-----------|

13



40.    Below are some more examples of the changed invoices that did not match the sales orders:

**L.D. Amory & Company, Inc.**

Hampton VA 23669

# Sales Order

| Date | S.O. No. |
| --- | --- |
| 1/25/2024 | 151 - 65658 |

| Name / Address | |
| --- | --- |
| J & K Seafood<br>800 Food Center Drive<br>Unit 94<br>Bronx, NY 10474 | J & K Seafood<br>800 Food Center Drive<br>Unit 94<br>Bronx, NY 10474 |

| Terms | Rep | P.O. No. | Ship Date | Via | FOB |
| --- | --- | --- | --- | --- | --- |
| JN | Net 15 | 1/25/2024 | mike | Tidewater | |

| Quantity | U/M | Piece Count | Item Code | Description | Price Each | Amount |
| --- | --- | --- | --- | --- | --- | --- |
| 2,485.00 | | 41 | Porgies - Lar... | 41 cases | 1.00 | 2,485.00 |
| 700.00 | | 12 | Porgies - Jum... | 12 cases | 1.25 | 875.00 |
| 383.00 | | 4 | Black Sea Ba... | 4 case | 2.50 | 957.50 |
| 1,250.00 | | 25 | Black Sea Ba... | 25x50lbs | 3.50 | 4,375.00 |
| 600.00 | | 12 | Black Sea Ba... | 12x50lbs | 4.50 | 2,700.00 |

| | **Total** | **$11,392.50** |
| --- | --- | --- |

15



L. D. Amory Company, Inc.
101 S. King St.
Hampton, VA 23669

# Invoice

| Date | Invoice # |
|---|---|
| 1/25/2024 | 75370 |

**Bill To**

J & K Seafood
800 Food Center Drive
Unit 94
Bronx, NY 10474

**Ship To**

J & K Seafood
800 Food Center Drive
Unit 94
Bronx, NY 10474

| Terms | Rep | P.O. Number | Ship | Via | Collect / Prepaid |
|---|---|---|---|---|---|
| Net 15 | JN | mike | 1/25/2024 | Tidewater | |

| Quantity | Item Code | U/M | Piece Count | Description | Price Each | Amount |
|---|---|---|---|---|---|---|
| 2,485 | Porgies - Large Mix | | 41 | 41 cases | 0.25 | 621.25 |
| 700 | Porgies - Jumbo | | 12 | 12 cases | 0.50 | 350.00 |
| 383 | Black Sea Bass, Medium | | 4 | 4 case | 1.25 | 478.75 |
| 1,250 | Black Sea Bass, Large | | 25 | 25x50lbs | 1.55 | 1,937.50 |
| 600 | Black Sea Bass, Jumbo | | 12 | 12x50lbs | 2.50 | 1,500.00 |

*5,960⁶⁹*

*price changed by John 2-3-24*

*6505*

Remit Payment to:
PO Box 518
Hampton VA 23669-0518

| **Total** | $4,887.50 |
|---|---|

41.    Below are some more examples of the changed invoices that did not match the sales orders:



# Invoice

**L. D. Amory Company, Inc.**
101 S. King St.
Hampton, VA 23669

| Date | Invoice # |
|------|-----------|
| 1/23/2024 | 75339 |

**Bill To**

J & K Seafood
800 Food Center Drive
Unit 94
Bronx, NY 10474

**Ship To**

J & K Seafood
800 Food Center Drive
Unit 94
Bronx, NY 10474

| Terms | Rep | P.O. Number | Ship | Via | Collect / Prepaid |
|-------|-----|-------------|------|-----|-------------------|
| Net 15 | JN | frankie | 1/23/2024 | Tidewater | |

| Quantity | Item Code | U/M | Piece Count | Description | | Price Each | Amount |
|----------|-----------|-----|-------------|-------------|--|------------|--------|
| 1,250 | Fluke-Medium | | 25 .79 | 25x50lbs | 1 ⁵⁵ | 1.00 | 1,250.00 |
| 1,250 | Fluke-Large | | 25 .78 | 25x50lbs | 1 ⁵⁰ | 1.25 | 1,562.50 |

$1,950.⁰⁰

-$5,625.ᶜᵗ

Remit Payment to:
PO Box 518
Hampton VA 23669-0518

**Total**  $2,812.50

42.    NAPOLITANO was the only salesperson at LD AMORY who handled the sales account for J&K SEAFOOD.

18

43. LD AMORY used the accounting software QuickBooks for their invoicing system.

44. During an interview with C.M., he advised that QuickBooks showed NAPOLITANO as the user who changed the invoices to lower the agreed upon prices. C.M. said the changes were usually made on Saturdays when no one was in the office except NAPOLITANO.

45. C.M. advised that NAPOLITANO was removed from the J&K SEAFOOD sales account. During this time C.M. noticed there were no discrepancies in sales order and invoices for J&K SEAFOOD.

46. When NAPOLITANO was added back to handling the sales account for J&K SEAFOOD, C.M. began noticing discrepancies in the invoices again. The invoices were altered to reflect a lower price than the sales orders.

47. On or about June 18, 2024, pursuant to a federal grand jury subpoena, bank records for NAPOLITANO's JP Morgan Chase bank were reviewed by your affiant.

48. A review of NAPOLITANO's records showed a high volume of "remote online deposits" into his account. Further investigation revealed that these "remote online deposits" were cashier's checks made payable to NAPOLITANO that were deposited into his account.

49. NAPOLITANO went to Woodforest Bank in Hampton, VA and purchased cashier checks made payable to himself and deposited them into his personal checking account at JP Morgan Chase bank.

50. The investigation revealed that the cashier checks and deposits corresponded to the timeframes of the altered invoices at LD AMORY.

51. Below are some examples of the cashier checks NAPOLITANO purchased and made payable to himself:

19

**WOODFOREST** NATIONAL BANK

54324018
02/27/2024
930 Hampton Walmart (930)

Purchaser: JOHN NAPOLITANO
Memo:

PAY   Four Thousand dollars

TO THE ORDER OF   JOHN VINCENT NAPOLITANO

TWO SIGNATURES REQUIRED

*$4,000.00*

CASHIER'S CHECK

Andrew Paar

---

**WOODFOREST** NATIONAL BANK

54354071
04/30/2024
930 Hampton Walmart (930)

Purchaser: JOHN NAPOLITANO
Memo:

PAY   Two Thousand Four Hundred Sixty dollars

TO THE ORDER OF   JOHN NAPOLITANO

TWO SIGNATURES REQUIRED

*$2,460.00*

CASHIER'S CHECK

Andrew Paar

37285636

---

**WOODFOREST** NATIONAL BANK

53945306
11/07/2022
930 Hampton Walmart (930)

Purchaser: JOHN NAPOLITANO
Memo:

PAY   Three Thousand dollars

TO THE ORDER OF   JOHN NAPOLITANO

TWO SIGNATURES REQUIRED

*$3,000.00*

CASHIER'S CHECK

Andrew Paar

---

52.   This activity continued into 2024.

53.   It is believed that NAPOLITANO received cash payments as part of the kickback scheme for his part in altering the J&K invoices from LD AMORY to lower prices.

54.   Pursuant to a federal grand jury subpoena, in or about August 2024, AT&T provided subscriber information and toll records for telephone number 516-507-0400. The records

identified NAPOLITANO, address 551 Settlers Landing Rd, Apt 204, Hampton, VA, as the subscriber of the account.

55.    The records from AT&T for telephone number 517-507-0400 listed an Apple iPhone 8 and an Apple iPhone 12 as cellular telephones associated with this telephone number.

56.    Pursuant to a federal grand jury subpoena, in or about August 2024, AT&T provided subscriber information and toll records for telephone number 718-679-2682. The records identified Frank Azatto ("FRANKIE"), address 111 Savo Loop, Staten Island, NY, as the subscriber of the account.

57.    On October 7, 2024, the FBI analyzed the aforementioned AT&T records and determined the following information:

58.    Between January 1, 2020, to May 1, 2024, telephone number 516-507-0400 had approximately 2,617 hits with telephone number 718-679-2682, which consisted of 2,614 voice calls and three text messages.

59.    Based on my experience and training many individuals committing fraud communicate using encrypted messaging platforms to communicate via text messages. These messages would not appear on the toll records of the cellular service provider. However, they would show up on the cellular device.

## CONCLUSION

60.     I submit that this affidavit supports probable cause for a warrant to search the items described in A-1 and the person described in Attachment A-2 for the SUBJECT DEVICES and seize the items described in Attachment B.

## REQUEST FOR SEALING

61.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Keysha L. Bailey
Special Agent
Federal Bureau of Investigation


This affidavit has been reviewed for legal sufficiency by Assistant U.S. Attorney Therese N. O'Brien.

Reviewed: _____
Therese N. O'Brien
Assistant United States Attorney

Subscribed and sworn before me on December __5__, 2024, in the City of Newport News, Virginia.

_____
UNITED STATES MAGISTRATE JUDGE

22

## ATTACHMENT A
## (SUBJECT DEVICES)

*Property to be Searched*

The property to be searched is listed below.  This warrant authorizes the forensic examination of the SUBJECT DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

1.  One Apple iPhone 8 cellular telephone

2.  One Apple iPhone 12 cellular telephone

## ATTACHMENT A-2
## (SUBJECT PERSON)

*Person to be searched for SUBJECT DEVICES*

The person of **JOHN VINCENT NAPOLITANO**, a white man approximately 5'7" tall and weighing approximately 250 pounds, born in 1957, and assigned a Social Security number ending in 3212, as pictured in the photograph below:



2

# ATTACHMENT B

## *Property to be seized*

1.      Without regard to form, and incorporating the definitions and technical terms set forth in the Affidavit, all items, records, and information found in or on the SUBJECT DEVICES relating to violations of 18 U.S.C. § 1343 (Wire Fraud) including attempting or conspiring to commit the same or aiding and abetting the commission thereof (collectively "the SUBJECT OFFENSES"), from on or about August 12, 2021, to present, that your Affiant has probable cause to believe were committed by JOHN V. NAPOLITANO ("NAPOLITANO"), as set forth herein and in the related Affidavit, together with evidence, fruits, and instrumentalities of the same, including the following records, information, and items:

   a. The identities and activities of NAPOLITANO and associated parties, including communications among the same or otherwise relating to the SUBJECT OFFENSES, including records relating to the planning, execution, flight, and concealment of the same;

   b. Records and/or data of all outgoing calls, incoming calls, and missed calls, voicemail messages, SMS and MMS text messages, instant (IM) messages, e-mail addresses and messages, IP logs, voice recordings, stored memos and calendars, still photographic images, video photographic images, GPS and map data, and any other stored electronic information related to the SUBJECT OFFENSES;

   c. Photographs and other images, to include clothing worn by NAPOLITANO during the surveillance of the SUBJECT OFFENSES, location data at the time of the SUBJECT OFFENSES, and photographs of vehicles used in the SUBJECT OFFENSES;

   d. Financial transactions and records, including all bank records, checks, credit card bills, account information, and other financial records showing proceeds relating to the SUBJECT OFFENSES and related conduct, including the planning, execution, and concealment of the same, and the movement, storage, concealment, and use of those proceeds;

   e. Website access and search history related to the SUBJECT OFFENSES and related conduct;

   f. Internet access associated with the SUBJECT OFFENSES or NAPOLITANO;

   g. Location data relating to NAPOLITANO and the SUBJECT OFFENSES and related conduct; and

   h. Knowledge, intent, or lack of mistake with respect to the SUBJECT OFFENSES, including communications regarding the planning, execution, and concealment thereof.

3

2.      The mobile device number (MDN) of the SUBJECT DEVICES; lists of telephone numbers, names, and addresses of the user of said telephone numbers stored in the phonebook or the contact list of the SUBJECT DEVICES.

3.      Access, use, ownership, or control of the SUBJECT DEVICES and related accounts, storage media, and ESI, including bills, relating to ownership, possession, or maintenance, addressed correspondence, receipts, and contextual information relating to the same.

4.      The presence or absence and related operation or effect of antivirus software, malicious software, or software to remove, conceal, or destroy data (e.g., a "wiping" program).

5.      For any computer, storage medium, or ESI whose seizure is otherwise authorized by this warrant, and any computer, storage medium, or ESI that contains, or in which is stored, records or information otherwise called for by this warrant (hereinafter "Device"), evidence of:

a.  who used, owned, or controlled the Device at the time the things described in this warrant were created, edited, or deleted, including a reasonable amount of time before and after to establish necessary use and context evidence, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  software (or the lack thereof) that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect such software;

c.  how and when the computer was accessed or used to determine the chronological context of Device access, use, and events relating to the SUBJECT OFFENSES and to the Device user;

d.  the Device user's state of mind, knowledge, and intent relating to the SUBJECT OFFENSES;

e.  attachment of storage devices or similar containers for ESI to the Device;

f.  counter-forensic programs (and associated data) used to eliminate data from the Device;

g.  evidence of the times the Device was used;

h.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the Device;

i.  documentation and manuals that may be necessary to access or conduct a forensic examination of the Device;

4

j.  records of or information about IP addresses used by the Device;

k.  records or information about the Device's Internet activity, including firewall logs; caches; browser history and cookies; "bookmarked" or "favorite" webpages; search terms the user entered into Internet search engines; and records of user-typed web addresses; and

l.  contextual information necessary to understand the evidence described in this Attachment.

This warrant is for the authorization to read, retrieve, image, copy, and seize information stored and contained on the above-described SUBJECT DEVICES and for authorization to present these items to persons capable of conducting such examinations and recovery. As used herein (and as noted above), the terms "records," "information," "computer," "storage medium," "storage media," "ESI" all retain the definitions set forth in the Affidavit. The terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form contained in or used by the device.

This warrant authorizes a review of the SUBJECT DEVICES and ESI seized or copied pursuant to this warrant to locate evidence, contraband, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any Government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the Government, attorney support staff, and technical experts. Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the Government and their support staff for their independent review.

During the execution of the search of the electronic devices as part of the search of the SUBJECT DEVICES and PERSON described in Attachments A-1 and A-2, regarding the electronic devices, law enforcement personnel are authorized to: (1) press or swipe the fingers (including thumbs) of NAPOLITANO to the fingerprint scanner of the device(s); (2) hold the device(s) in front of NAPOLITANO and activate the facial recognition feature; and/or (3) hold the device(s) in front of the face of NAPOLITANO and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant. This warrant does not allow law enforcement personnel to use the fingerprints of persons who are not NAPOLITANO. The government will not use as evidence against NAPOLITANO in this case the mere fact that the defendant used his fingerprints or face to unlock any device.

5